(69 Misc. Rep. 241.)

PHARAOH v. BENSON et al.

(Supreme Court, Equity Term, Suffolk County. October, 1910.)

1. PROPERTY (§ 2*)—RIGHT TO EXTINGUISH INDIAN TITLE TO LAND.
    The patent granted by Governor Dongan in 1686 to the freeholders and inhabitants of East Hampton, gave them the ownership of Montauk Point subject to the Indian right of occupancy, with the perpetual and exclusive right to purchase the land from the Indians. *Held*, that the right to extinguish the Indian title was a right of property.
    [Ed. Note.—For other cases, see Property, Dec. Dig. § 2.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**2. INDIANS (§ 15*)—PURCHASE OF LAND—CONSTITUTIONAL PROVISIONS.**

Const. 1777, § 37, forbidding the purchase of Indian land, did not ter-- minate the right granted by the Dongan charter to extinguish the Indian title, such Constitution providing that nothing therein should be construed to affect any grant of land within the state made by authority of the king, nor to annul any charter to bodies politic by him.

[Ed. Note.—For other cases, see Indians, Dec. Dig. § 15.*]

**3. CONSTITUTIONAL LAW (§ 123*)—IMPAIRING OBLIGATION OF CONTRACT.**

After adoption of the federal Constitution forbidding a state to pass any law impairing the obligation of contracts, the state could not impair the grant in the Dongan charter nor the right to make it effectual by extinguishing the Indian rights.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 293–297; Dec. Dig. § 123.*]

**4. INDIANS (§ 15*)—PURCHASE OF LAND—STATUTORY PROVISIONS.**

Act March 18, 1788 (Laws 1788, c. 85), to punish infractions of the article of the Constitution of 1777, forbidding purchases of lands from the Indians without consent of the Legislature, being no broader in its application than the constitutional prohibition itself, did not affect the rights granted by the Dongan charter, especially as such rights could not be taken without compensation.

[Ed. Note.—For other cases, see Indians, Dec. Dig. § 15.*]

Action by Wyandank Pharaoh, Chief and Head of the Montauk Tribe of Indians, against Jane Ann Benson and another, executrices of Arthur W. Benson, and others. Judgment for defendants.

Charles O. Maas (Lawrence W. Trowbridge, of counsel), for plaintiff.

Daly, Hoyt & Mason, for defendants Benson and another.

Austin & McLanahan, for Montauk Co.

Alexander T. Mason, for John J. Pierrepont and Henry R. Hoyt, as executors and trustees, etc.

P. Tecumseh Sherman, for Alfred W. Hoyt.

Joseph Keany, for Long Island R. Co.

BLACKMAR, J. On the 6th of August, 1660, when the Montauk Indians after their war with the Narragansetts were living near and under the protection of the whites at East Hampton, they executed a deed of the land now known as Montauk Point to the inhabitants of East Hampton, reserving a yearly rental of £10 sterling for 10 years. As a part of the same transaction the whites gave back a so-called counterbond, agreeing to permit the Indians to come back on the land under certain conditions. On February 11, 1661, the Indians executed another instrument to the whites, therein stating that they were to come back on the land; and, expressing their gratitude to the whites for their aid and assistance in the war with the hostile Algonquin Tribe, they deeded to the whites a portion of the point lying to the west of Ft. Pond and called Hitherwood. The fee of the land was in the crown of England, subject to the Indian right of occupation. This right was not transferable except to the crown or its grantees. For the purpose, therefore, of perfecting the title of the whites, Richard Nicholls, Governor General under the Duke of York, who held a grant from the crown, issued a patent confirming the purchase made

---

by the whites. The title of the inhabitants of East Hampton to that portion of Montauk Point west of Ft. Pond thus became perfect, and, with an unimportant exception, discharged from all Indian rights. The patent of Gov. Nicholls was in terms broad enough to cover the whole point, but the effect of the three instruments confined the purchase of the whites to the limits mentioned. Another portion of the point, called "nine-score acre purchase," was vested in the whites by an Indian deed dated December 1, 1670, confirmed by a patent granted by Gov. Lovelace.

On December 9, 1686, Gov. Thomas Dongan granted a patent to the freeholders and inhabitants of East Hampton, wherein, after reciting that a part of the tract of land called Montauk remained as yet unpurchased of the Indians, he granted to the said inhabitants the tract now called Montauk with the perpetual and exclusive right to purchase the same from the Indians. The inhabitants thereby became the owners of the land subject to the Indian right of occupancy, and secured the exclusive right to extinguish the Indian title by purchase. On July 26, 1689, the Indians conveyed the whole of Montauk Point to the whites; and, on the same day, the whites executed an instrument giving to the Indians leave to plant "what corn soever they have occasion for to plant from time to time when they see cause themselves and their heirs forever, upon the land as purchased of them by us" reserving a rental of one ear of Indian corn per year. Subsequently, on the 3d of March, 1702–03, the right vested in the Indians to plant corn wherever they saw fit having led to disputes as to the validity of the grant, the Indians gave a deed of confirmation of the tract and the whites gave a bond for the payment of £100 sterling. On the same day an agreement was made which recited that differences had arisen regarding the rights of the Indians under the so-called lease of 1687, and provided that the Indians should fence in land as their general field on North Neck, leaving the rest of the point to the whites, and that the Indians had the right to quit the North Neck and fence in a field between Great Pond and Oyster Pond, and to keep for their own use on the land 250 swine and 50 horse and cattle. A supplemental agreement was made in 1754, the purpose of which was to exclude foreign Indians and certain half breeds from sharing in the Indian rights. Many years ago the Indians abandoned North Neck and moved to the field between Great Pond and Oyster Pond, containing about 1,200 acres, which was fenced in according to the agreement and is known as Indian Field. This action is brought to ascertain, define, and enforce the rights of the Indians to Indian Field.

For nearly 200 years the Indians and their descendants lived on Indian Field. The inhabitants of East Hampton, the owners of the fee of the land subject to their rights, never disputed those rights; but, by a long course of dealing, recognized them. During this long period the number of the Indians was greatly reduced. Their blood became so mixed that in many of them Indian traits were obliterated. They had no internal government, and they lived a sort of shiftless life, hunting, fishing, cultivating the ground "Indian fashion" as a witness called it, and often leaving for long periods and working in

some menial capacity for the whites. In 1885 they were reduced to two or three families; and Arthur W. Benson, now deceased, having purchased the fee of the land subject to the Indian rights on a partition sale, began negotiations with them; and, by the payment of money and the conveyance to them of certain parcels of land, gradually secured releases from them and induced them to move off the land. Soon thereafter the Indians began to attempt to recover the possession. An action was brought in the name of the Montauk Tribe but it failed through a judgment of the court holding that, in the absence of legislative permission to bring an action, the tribe had no standing in court. An action was then brought by one alleged member of the tribe for the benefit of all, which also failed because the Indians had no statutory right to sue. The Legislature was appealed to, and, on April 10, 1906, passed an enabling act permitting an action to be brought, but providing that the act should not be construed as conferring tribal rights on any individuals, but that the question of the existence of the Montauk Tribe should be determined by the court. Pursuant to such enabling act this action was brought.

The plaintiff contends that the right of the Indians to Indian Field was a tribal right carved out of the original Indian title; that the Indians were under a disability to part with their rights; that, up to the time their rights were purchased by Mr. Benson, they preserved a tribal organization which, although imperfect, was enough to sustain and preserve their rights as a tribe to the land; that the purchase from them was a wrongful act, condemned by the Penal Code; that a condition of disintegration, produced by the wrongful act of the defendants' testator, did not work a destruction of the tribe, or, at least, that he could not profit by his own wrong in so asserting; and that, therefore, the Indians are still entitled to their rights in Indian Field as defined by the contract, agreements, and deeds. All these propositions, both of fact and law, are denied by the defendants. It was conceded on the trial that the rights of the Indians to North Neck and Hitherwood had long been extinguished by abandonment.

I am of the opinion that the rights of the Indians were not, as claimed by the defendants, licenses or privileges granted by the whites to individual Indians, but were a portion of the original Indian right of occupation. The relative rights of Indians and the sovereign states that assert and maintain ownership of the soil by discovery, conquest, or grant are not to be defined in terms of feudal tenures. There is no feudal estate which furnishes analogies to the Indian rights. These rights are neither easements in gross, tenancies, nor licenses. They are simply Indian rights of occupancy. These rights grew out of the claim by the whites to the proprietorship of the soil which rested in discovery and the impossibility of treating the Indians as trespassers. As the sovereign claimed to own the soil, the extinguishment of the Indian title inured to his benefit. He alone, therefore, had the right to purchase from the Indians. So arose the rule that no one could purchase of the Indians without the sovereign's consent, and this rule made the Indians the wards of the state. Prior to the Dongan charter the crown owned the fee to Montauk Point, except Hitherwood

and the nine-score acre purchase. After the Dongan charter and prior to July, 1687, the freeholders of East Hampton had the fee subject to the right of Indian occupancy and had the sole right of extinguishing the Indians' rights by purchase.. Papers were executed by both parties in July, 1687—a deed by the Indians and a so-called lease or bond by the whites—which reduced the Indian rights to raising corn whenever and wherever they saw fit on the land. This right was secured to the Indians and their heirs forever. The two instruments must be read together, and the effect obviously was simply to limit and restrict rights which the Indians already had. Subsequently the general right to plant corn wherever they saw fit on Montauk Point was, by agreement, changed to a right of occupancy of North Neck or, in lieu thereof, of Indian Field. Assuming the validity of these instruments, which I do not doubt, their effect was to limit the Indian right of occupancy to Indian Field. The contemporary instruments read together favor this view, and for nearly 200 years the whites treated with the Indians as if their occupancy were tribal.

These were the rights which were purchased of the descendants of these Indians by Mr. Arthur Benson in 1885. If this purchase was valid, the rights were extinguished or merged in the fee then owned by Mr. Benson as successor of the freeholders of East Hampton. The Dongan charter conveyed Montauk Point to the freeholders and inhabitants of East Hampton, gave them authority to purchase said tract of the Indians and declared that they and their successors were the only persons capable in law to purchase said tract. This authorized an extinguishment of the Indian title by purchase without restraint as to terms and conditions and without the necessity of recourse to the sovereign for further consent or confirmation. No one doubts that the purchase made in July, 1687, was a valid exercise of the power thereby granted. The subsequent agreements of 1702 and of 1754, both being restrictions of the Indian title, derive their authority from the Dongan charter. Why does not the charter also authorize the Benson purchase? The power conferred by the charter is not limited in point of time. Unless repealed or modified by some other enactment, it exists to-day. This leads to an inquiry whether this right to purchase from the Indians has been repealed or modified.

The charter was not swept away by the enactment of the Constitution of the state, but was expressly preserved by a saving clause. Const. 1777, § 36. The plaintiff claims that the Constitution gave the charter no added vitality, but simply preserved it from destruction. In a sense that is true. So far, certainly, as the charter established a municipal government, it was subject to repeal or modification by the Legislature, notwithstanding the adoption of the Constitution. But I would not hastily agree to the proposition that property rights were no more secure under the constitutional government, instituted by the people to preserve the "rights and liberties of the good people of the state," than it was under colonial government established under royal prerogative. I think the right to extinguish the Indian title contained in the Dongan charter is a right of property. It accompanied a grant of the fee of the land. Without the right to purchase of the Indians,

the grant of the fee was barren. The plaintiff urges that to regulate the right is not to destroy it. That is true. But to forbid the freeholders of East Hampton to purchase of the Indians is not to regulate the right of purchase, but to rescind it. The Constitution of 1777 also contains a provision forbidding the purchase of Indian lands. Section 37. Did this affirmative provision operate to terminate the rights in question which were granted in the Dongan charter? At that time there was no federal Constitution forbidding a state to impair the obligation of a contract, so the question is purely one of the construction of the Constitution. The Constitution provides (section 36) that nothing therein contained shall be construed to affect any grant of lands within the state made by the authority of the king nor to annul any charter to bodies politic by him. It follows, therefore, that the provision forbidding the purchase of Indian lands contained in the Constitution does not affect the Dongan charter. The charter then was intact, notwithstanding this provision of the Constitution. On the 4th day of March, 1789, the Constitution of the United States of America, having been approved by the requisite number of states, including the state of New York, went into effect. Thereafter there were certain expressed limitations on the legislative power of the states. Among them the states were forbidden to pass any law impairing the obligation of contracts. Under the Dartmouth College Case the state had thereafter no power to impair the grant of lands contained in the Dongan charter and the right to make the grant effective by extinguishing the Indian rights.

There remains then only to consider whether any law was passed by the state of New York in the interval between the adoption of the state Constitution in 1777 and the adoption of the United States Constitution in 1789 which affects the grant. On the 18th day of March, 1788 (Laws 1788, c. 85), an act was passed entitled "An act to punish infractions of that article of the Constitution of this state, prohibiting purchases of lands from the Indians, without the authority and consent of the Legislature; and more effectually to provide against intrusions on the unappropriated lands of this state." This act in the broadest term made it an offense to purchase lands of the Indians or to enter on any lands purchased of any Indian or Indians since the 14th day of October, 1775. Did this act impair the rights to extinguish the Indian title vested by the Dongan charter? There is no general bill of rights contained in the Constitution of 1777, except that the Constitution declares that no member of the state shall be disfranchised or deprived of any of the rights and privileges secured to the subjects of the state by the Constitution, unless by the law of the land or the judgment of his peers. But there are certain fundamental principles which are necessarily implied in all free republican forms of government. Among these is the right of property. These rights cannot be transferred from one person to another nor seized by the state without compensation. But, however this may be, an act should not be construed to effect this result where any other reasonable construction is possible. The act of 1788 is declared to have been enacted to carry out the constitutional prohibition against purchasing from

Indians. The act is, therefore, no broader in its application than the constitutional prohibition. As the constitutional provision did not affect this right granted by the Dongan charter, no more did the act of 1788. There were then many Indians and Indian tribes within the limits of the state, and the act had a broad scope of application without holding that it impaired property rights. I am, therefore, of the opinion that it was not intended to and did not deprive the freeholders of East Hampton of the right of extinguishing the Indian title. The authorization of the Dongan charter permitted the purchase of the Indian rights by Mr. Benson, who was the successor in interest of the freeholders of East Hampton. I hold, therefore, that the purchase and extinguishment of the Indian rights of occupancy were legal and binding on the plaintiff.

To aid counsel in drawing findings, I will briefly state my conclusions on other points. The judgment in Grinnell v. Baker is not an adjudication binding on the parties to this action as to the existence of the Montauk Tribe and its tribal rights. The deed in partition does not so estop the purchaser as to preclude him from showing the real facts as to the existence of the tribe. Prior to the purchase of the Indian rights by Mr. Benson, there were a number of Montauk Indians in the enjoyment of tribal rights in Indian Field and a sufficient tribal organization to preserve to them those rights. There is now no tribe of Montauk Indians. It has disintegrated and been absorbed into the mass of citizens. If I may use the expression, the tribe has been dying for many years. The separation and scattering of the members, due to the purchase by Mr. Benson, gave it the final death blow. But I hold that the purchase was a lawful act, and there is no consideration of justice which makes me loath to find that there is no longer a tribe of Montauk Indians. As the Indians are wards of the state, and as this action was authorized by an enabling act, I do not think that costs should be imposed on the plaintiff.

Judgment accordingly.